1   Carl Wescott
    PO Box 190875
2   San Francisco, CA 94966
    *in propria persona*
3   +1 415 335 5000

4

5                        UNITED STATES DISTRICT COURT

6                        NORTHERN DISTRICT OF CALIFORNIA

7                        SAN FRANCISCO DIVISON

8

9   Carl Alexander Wescott,              )   Case Number CV 17 5837 SK WHO

                        Plaintiff        )
10
                                         )   COMPLAINT FOR VIOLATIONS OF THE
11
    -------------- versus -------------- )   FDCPA; RETALIATION UNDER FIRREA;
12
                                         )   BREACH OF CONTRACT; CONVERSION;
13
    Monette Stephens and                 )   LEGAL MALPRACTICE; WRONGFUL
14
    Michelle Harris, esquire             )   EVICTION; MORTGAGE FRAUD; CONSUMER
15
                        Defendants       )   FRAUD; CIVIL FRAUD.
16

17          **PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS**
18   **Hearing:  March 26th, 2018, 9:30 am; Courtroom A, 15th Floor, 450 Golden Gate Avenue.**

19

20          Carl Wescott, appearing *pro se*, hereby replies to Defendant Harris' Motion to

21   Dismiss:

22

23   Introduction

24   The Defendant's attack on this Complaint is a juristic reproduction of the classic Soviet Air

25   Defense doctrine as described by strategic expert, Edward Luttwak:

26          They ended up designing, developing, producing, deploying to this day about nine or
27          ten different kinds of missiles. Now, from the point of view of civilian efficiency, this
            is a disaster because here we [have] nine different sets of spare parts, all the different
28          training schemes, no compatibility. It was very inefficient.

But in war, when you fly against a Soviet Union-style missile defense, you cannot counter-measure any one of the missiles with any one counter-measure because there are all these different missiles using different principles of guidance. You can't overfly it because some of these missiles are so high altitude, like the SAM-5, they go above the height any tactical fighter can fly. And you can't underfly, because they have these ultra-low altitude, and indeed they have a whole range of anti-aircraft guns as well. Against the single-missile solution that the U.S. produces, you can fly over it and you can fly under it. And, more to the point, you can counter-measure it because you're dealing with one missile, with one set of characteristics.

In other words, what the Defendant has done is produce a plethora of arguments that range from the dubious to the sanctionable. The Plaintiff must address *all* of these arguments, any one of which is, at least theoretically, a knock-out blow if left unaddressed. The Defendant has been simultaneously inefficient, but potentially effective. The Defendant's style wastes judicial resources; wastes the Plaintiff's time; and is intended to sew confusion. The Plaintiff, because he has attempted to tell the truth (e.g. with his one missile) is thus at a certain tactical disadvantage unless the Court bears uppermost in mind that litigation is a truth-seeking enterprise and that a multiplicity of marginal arguments is not a viable *truth-seeking* strategy.

This is fundamentally a legal malpractice claim combined with a conspiracy with her client. A lawyer purposefully and recklessly created ambiguity about whether she was representing the Plaintiff. The Plaintiff does not know whether Ms. Harris solicited her client, Ms. Stephens, in this diabolical scheme, or whether Ms. Stephens solicited Ms. Harris, but the end-result of their conspiracy was devastatingly effective. This Defendant, Ms. Harris, then proceeded to systematically plant misinformation and dis-information about the Plaintiff's obligations under California law. The result of this deception was that the Plaintiff paid money – including sums directly to the lawyer – that he would not have had to pay under California law and otherwise compromised his strategic position. From the standpoint of system integrity (the Plaintiff asks the Court to indulge his vocabulary as he is a programmer by training) this is a lethal threat. The lawyer directly collected fees from her adversary and dispensed "legal advice"

to the adversary *that was intended to abuse the adversary's trust and harm him*. The lawyer succeeded. Because the adversary in this case was not a lawyer, it took some time for him to realize that he was lied to and that his trust was abused.

The Defendant's argument – which appears on the surface to have the intricacy of a Rube Goldberg contraption – distills to this: her fraud is protected by the First Amendment and by Litigation Privilege and the Plaintiff took too long to figure out that he'd been taken. The Defendant's problem – more specifically, among her many problems – is that California does not apply either a First Amendment or Litigation privilege for malpractice claims. It's not an unsettled issue; it's not a close issue; the Defendant's argument is patently frivolous. Alternatively and conjunctively, the First Amendment and the Litigation Privilege cannot be used to protect criminal conduct and the Defendant committed both fraud and extortion as a matter of black letter California law. Finally, in assessing the reasonableness and diligence of legal malpractice claimants, California law does not hold them to the standard of care of lawyers. Legal malpractice often requires expert testimony. A non-lawyer – especially when unrepresented – is not expected to instantaneously identify legal misconduct. The Defendant, in effect, argues that the Plaintiff should have been expecting her to lie. This is a lacerating commentary on the ethics of California lawyers and it is, happily, not consistent with the view of California Courts.

If lawyers in California are permitted to deceive adversaries into believing they are representing their interests; collect money directly from the adversaries; and then lie about the law to the adversaries' prejudice, we may expect a sizable minority of California lawyers to repeat this pattern endlessly. This is not behavior that should be reinforced by the Bar or the Courts of California.

1    1.  Neither the First Amendment Nor the Litigation Privilege Protect California

2    Attorneys Charged with Malpractice

3    The Plaintiff will reverse the order of the arguments as presented in the Defendant's brief

4    because the Defendant's Anti-Slapp/Litigation Privilege argument serves as the basis for the

5    Defendant's claim that the burden on her Motion to Dismiss is shifted to the Plaintiff and

6    justifies her recourse to evidence outside the four corners of the complaint, such as her self-

7    serving Affidavit.  Indeed, the proper burden on a Motion to Dismiss belongs with the

8    Defendant:

9

10       ' "We treat the demurrer as admitting all material facts properly pleaded, but not
         contentions, deductions or conclusions of fact or law.  [Citation.]   We also consider
11       matters which may be judicially noticed."  [Citation.]  Further, we give the
         complaint a reasonable interpretation, reading it as a whole and its parts in their
12       context.  [Citation.]  When a demurrer is sustained, we determine whether the
         complaint states facts sufficient to constitute a cause of action.  [Citation.]  And
13       when it is sustained without leave to amend, we decide whether there is a reasonable
         possibility that the defect can be cured by amendment: if it can be, the trial court has
14       abused its discretion and we reverse; if not, there has been no abuse of discretion and
         we affirm.  [Citations.]  The burden of proving such reasonable possibility is
15       squarely on the plaintiff.'  [Citations.]"  (*Zelig v. County of Los Angeles* (2002) 27
         Cal.4th 1112, 1126 (Zelig ).)
16

17

18       Accordingly, if the Defendant is incorrect in her "burden shifting" (e.g. Anti-Slapp)

19    argument, her affidavit is improperly introduced. If the Defendant is incorrect then this Court

20    should treat the allegations of the complaint as true for the purposes of this Motion without

21    recourse to extraneous evidence. Since this issue is so important to the Court's consideration of

22    the Defendant's Motion, the Plaintiff chooses to address it first as it will have important

23    implications for the Defendant's collateral arguments.

24

25       In making her cause exhaustively if not persuasively (it may even be said that the

26    Defendant brilliantly defends a case the Plaintiff has never brought), the Defendant engages in an

27    initial bit of prestidigitation.  She treats this case as if it is solely about a litigation sore loser

28

complaining that she did too good a job representing his ex-wife. This is undoubtedly how the

Defendant perceives, or at least would have this Court perceive, the unfolding of events.

However, the heart of the Plaintiff's case is that the Defendant led him to believe she was

representing and protecting *him* and she abused his trust by enriching her client and herself as his

expense. <u>In fact it's easy to do a good job for one client if you simultaneously represent and</u>

<u>betray the client's adversary</u>. Indeed, it's *too easy* and, for that reason, Courts should be on guard

against this very scheme.

     Moreover, the most promising hunting ground for a putatively predatory lawyer is

domestic relations. California law holds that the parties stand in a fiduciary relation to each

other, California Family Code 721. By definition, the parties have been in a close, intimate

relationship. The Plaintiff pleads in this case that he asked his then-wife (on the night of

February 25th, 2014) to find a lawyer to handle the their separation and likely divorce for both of

them.  The Plaintiff and his then-wife had gone through a bankruptcy and had almost no money

and the best path for them was to resolve things amicably and have one attorney handle the

necessary legal parts.  Ms. Stephens said she would, and Defendant Harris was that attorney, that

Plaintiff believed was helping them both. Everything the Defendant said, in the first critical

months of her retention, confirmed the Plaintiff's belief and the Plaintiff does not believe this

was an accident.  The Plaintiff believes a jury won't believe it was an accident either.

     While it is true that Courts confer immunity for attorneys acting as advocates and

petitioners, whether pursuant to the Anti-Slapp statutes, Litigation Privilege, or *Noerr*

*Pennington*, these doctrines are not conceived as safe harbors against attorney malpractice and

fraud. At its heart, this is a *malpractice* case. The Defendant wrongfully injects extraneous and

prejudicial (and inaccurately summarized) "facts" into this Motion going lightyears outside the

pleadings. But what the Plaintiff has fundamentally pled is that the Defendant in this case, a

highly skilled lawyer, presented her role *at best* ambiguously, convincing the Plaintiff that she was looking after his interests as well as his wife's interests. In her inaugural communication, she described her role as "*moving the parties' case from Court*" to a "*series of private agreements.*" See, Complaint at par. 7 and Exh A attached thereto. That statement was an unvarnished lie and the Defendant knew it. The Defendant had been retained to represent the Plaintiff's wife in litigation and to obtain a decree therein that would favor his wife and disfavor the Plaintiff. The Defendant was a gunslinger disguised in the garb of a Parson; a combatant wearing a red-cross symbol. This is outrageously unfair and it is actionable.

When Defendant Harris role in this case is correctly seen for what it is - legal malpractice - it becomes clear that the immunities the Defendant claims are unavailing. If California applied either the Anti-Slapp Statute, CCP 425.16 or the Litigation Privilege CCP 47.b to legal malpractice, clients of California lawyers would be helpless to obtain any remedy for negligence or fraud. Fortunately, California Courts recognize this fact and decline to apply either privilege in the malpractice context, especially arising out of a breach of loyalty. *Kolar v. McIntosh & Hammerton*, (2006) 145 Cal.App.4th 1532, *Benasara v. Mitchell Silberberg & Knupp, LLP* (2004) 123 Cal.App.4th 1179, *Freeman v. Schack* (2007) 154 Cal.App.4th 719, *PediWave Corp. v. Simpson Thatcher & Bartlett LLP* (2009) 179 Cal.App.4th 1204, *Castleman v. Sargaser*, (2013) 216 Cal.App.4th 481, *Loanvest v. Utrecht* (2015) 235 Cal.App.4th 496, *Jesperson v. Zubiate-Beauchamp* (2003) 114 Cal.App.4th 624, 627.

Anticipating the argument that the Defendant in this case disputes the formation of the attorney-client relationship, in *Sprengel v. Zbylut* (2015) 241 Cal.App. 4th 140, the Court of Appeal went one step further when it held that the anti-SLAPP statute does not apply even when an attorney-client relationship between the parties has not been established but is asserted by the Plaintiff.

1       The Defendant conjunctively – and incoherently – raises a *Noerr-Pennington* defense.

2 Under the *Noerr-Pennington* doctrine, a party that petitions the government (e.g. through

3 litigation) is (usually) immune from *Antitrust liability. Cheminor Drugs, Ltd. v. Ethyl Corp.* 168

4 F.3rd 119, 122 (3rd Cir. 1999). *Noerr-Pennington* has never been applied to protect a lawyer from

5

6 allegations that he fraudulently or incompetently represented his client.

7       The Plaintiff does not anticipate amending to include allegations that the Defendant

8 violated Federal Antitrust law.

9       This means that the linchpin of the Defendant's "defense" occupying approximately 8

10 pages of the Defendant's brief (13-21) is completely without foundation.

11

12     1.  (a) <u>Neither The Litigation Privilege Nor the Anti-Slapp Statute Apply to Illegal</u>

13           <u>Conduct</u>

14

15       The California Supreme Court in *Flately v. Mauro*, 139 P.3rd 2 (2006) declined to apply

16 either the Litigation Privilege or the Anti-Slapp statute to illegal conduct including, specifically

17 extortionate conduct. The Court defined extortion as follows:

18           Extortion is the obtaining of property from another, with his consent, induced by a

19           wrongful use of force or fear." (Pen. Code, §518)). Fear, for purposes of
          extortion "may be induced by a threat, either 2. To accuse the individual

20           threatened of any crime, or 3. To expose or impute to him any deformity,
          disgrace, or crime." (Pen.Code, § 519.) "Every person who, with intent to

21           extort any money or other property from another, sends or delivers to any person
          any letter or other writing, whether subscribed or not, expressing or implying, or

22           adapted to imply, any threat such as is specified in Section 519, is punishable in
          the same manner as if such money or property were actually obtained by means of

23           such threat."  (Pen.Code, § 523.)

24

25       It is consistent with this holding to decline to apply the Privilege or the Statute to the

26 allegations of fraud – or for that matter, to the counts demanding an Accounting or alleging

27 Conversion in this case. Perhaps the brazen attempt by the Defendant to create an attorney

28

privilege for <u>conversion</u> is the most outrageous of her many blasphemies. Surely the "litigation privilege" is not a license for California attorneys to steal! Especially since, in this case, the question of proper responsibility for the Defendant's fees **was not litigated because of the Defendant's out of court lies**. Conjunctively, the Defendant is guilty of extortion as defined in the Penal Code: she induced the Plaintiff to voluntarily pay money by falsely asserting that the law required him to pay his wife $15,000 per month (despite the facts that the Plaintiff had not made more than $20,000 per year for many consecutive years, and that spousal support is based on earned income per California law) and to pay her fees directly. The law may be enforced by force or coercion. Accordingly, the Defendant obtained the Plaintiff's funds by force and fear bringing her conduct directly within the exception carved out by our Supreme Court in *Flately*. <u>As the Plaintiff has paid monies to both Ms. Stephens and Ms. Harris based on Harris' lies to him, he may amend to add a count for extortion against this Defendant.</u>

2. <u>The Four Year Statute of Limitations Applies to this Claim</u>

CCP 340.6 establishes the relevant statute of limitations:

> (a) An action against an attorney for a wrongful act or omission, other than for actual fraud, arising in the performance of professional services shall be commenced within one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the facts constituting the wrongful act or omission, or four years from the date of the wrongful act or omission, whichever occurs first

The applicability of the statute of limitations in a legal malpractice claim is thus, not surprisingly, fact intensive:

> Moreover, we find nothing in the language or history of section 340.6(a)(1) indicating the Legislature intended, in codifying decisional law, to alter the well-settled principle that in legal malpractice actions statute of limitations issues, including injury, are at base factual inquiries. That established standard is reiterated or alluded to at least four times in Budd v. Nixon, supra, 6 Cal.3d at pages 198, 202, 203-204, from which the "actual injury" tolling provision of the statute derives. (Laird v. Blacker (1992) 2 Cal. 4th 606, 612 [7 Cal. Rptr. 2d 550, 828 P.2d 691].) Had the Legislature meant to significantly modify the law, it surely would have made that intention explicit. *Adams v. Paul*, (1995)n 11 Cal.4th 583.

1

2          The Defendant seeks to leap-frog that factual inquiry by arguing that the Plaintiff's

3   *eviction* conferred constructive notice of his legal malpractice claim. However, as our Supreme

4   Court pointed out in *Neel v. Magana, Olney, Levy, Cathcart & Gelfand*, 6 Cal.3rd 176 (1971):

5
            In the first place the special obligation of the professional is exemplified by his duty not
6           merely to perform his work with ordinary care but to use the skill, prudence and diligence
            commonly exercised by practitioners of his profession. If he further specializes within the
7           professional, he must meet the standards of knowledge and skill of such specialists.

8           Corollary to this expertise is the inability of the layman to detect its misapplication; the
            client may not recognize the negligence of the professional when he sees it. He cannot be
9           expected to know the relative medical merits of alternative anesthetics nor the various
            legal exceptions to the hearsay rule. *If he must ascertain malpractice at the moment of its*
10          *incidence, the client must hire a second professional to observe the work of the first, an*
            *expensive and impractical duplication clearly destructive of the confidential relationship*
11          *between the practitioner and his client.*

12          In the second place, not only may the client fail to recognize negligence when he sees it,
13          but often he will lack any opportunity to see it. The doctor operates on an unconscious
            patient; although the attorney, accountant and stockbroker serves the conscious client,
14          much of their work takes place outside the client's view. (Emphasis added).

15
16         The Plaintiff alleges that the Defendant told material lies about the requirements of the

17   law (see, for example, Complaint pars. 7-9). Based on Business & Professions Code 6068 (d) the

18   Plaintiff would have had a right to rely on the Defendant not to lie even without the initial

19   deception concerning her allegiance. The Plaintiff's eviction was the first inkling he had that the

20   Defendant was not acting as his attorney. He concluded, at the time, that the mistake was his

21   own. He still believed that the Defendant was an ethical professional who had been truthful with

22   him (See Sworn Declaration of Carl Wescott attached as Exh A hereto). The Defendant would

23   have the Court compel the Plaintiff to have immediately made the leap from her presentation of

24   an adversarial petition to the ineluctable conclusion that he had been lied to about the need to pay

25   his ex-wife $15,000 per month and the need to directly pay the Defendant her fees. The Plaintiff,

26   frankly, made no such leap.

27

28

Part of the key to understanding the Plaintiff's reticence lies in the quotation from our Supreme Court in *Neel*. The disparity in expertise between a lawyer and a non-lawyer, even in the case of an educated non-lawyer like the Plaintiff is vast and intimidating. The relationship is one of confidence and trust. Naturally, the Plaintiff's trust would have been shaken by the eviction. He did in fact have brief conversations with other lawyers concerning the propriety of the eviction itself. But it is properly a question of fact, for the trier of fact, to determine whether the Plaintiff should have immediately concluded that he had been deceived from the beginning by the Defendant.

As the burden has not been shifted in this case, the contents of the Defendant's affidavit should be ignored in considering a Motion to Dismiss. For the convenience of the Court, the Plaintiff attaches his own Sworn Declaration as Exhibit "A" setting out the reasons why he did not immediately believe he was the victim of malpractice.

The Declaration points out another material fact that would be material for a trier of fact in assessing the reasonableness of the Plaintiff's delay in suing this Defendant. The Defendant rendered the Plaintiff homeless, and would not return his possessions, including some of the most critical ones that he needed to work, like his laptops and office files. While homelessness is not a "disability" as set out in Code of Civil Procedure 352, it is necessarily a factor in assessing the overall reasonableness of the Plaintiff's conduct. The Defendant, after depriving the Plaintiff of shelter, without a computer or an internet connection, expects him to calmly research the law for the purpose of uncovering her misrepresentations. The Plaintiff was distracted by the task of sheer survival.

The Plaintiff and his then-wife Ms. Stephens lived in three houses at the time – San Francisco, Santa Barbara, and Tahoe – but yet Defendant Harris evicted the Plaintiff in violation of California family codes that give both parties a roughly equal standard of living while going

through the divorce process. Rather than that equal standard, with Harris' actions, Defendant Stephens lived in three houses, had a new luxury vehicle, and went skiing every winter weekend. The Plaintiff had no possessions, was indigent, and homeless and on the street (and still required to pay $15,000 per month). The Plaintiff went and got CalFresh (aka Food Stamps) as part of his efforts in survival.

If you go ask ten extremely well-educated non-lawyers at a cocktail party, who have never been divorced or contemplated it, the Plaintiff asserts that at least nine of the ten will have no idea what the relevant laws are. It has taken years for the Plaintiff (beyond his basic survival – he is still homeless) to research the law, understand it better, and now finally understand what Ms. Stephens and Ms. Harris conspired to do, and then succeeded with devastating effectiveness.

### 3.   Harris Violated the Fair Debt Collection Practices Act

Here are the relevant definitions from the Fair Debt Collection Practices Act 15 USC 1692 a:

> (3) The term "consumer" means any natural person obligated or allegedly obligated to pay any debt.
> (4) The term "creditor" means any person who offers or extends credit creating a debt or to whom a debt is owed, but such term does not include any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another.
> (5) The term "debt" means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.
> (6) The term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. Notwithstanding the exclusion provided by clause (F) of the last sentence of this paragraph, the term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts. For the purpose of section 1692f(6) of this title, such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests.

1
2
3
4
5
6
7
8

The Complaint alleges, specifically, that the parties were burdened, at the time of their divorce, by massive consumer debt (Complaint, paragraph 2). The parties had over $500,000 on their credit cards. The Complaint also alleges that Harris schemed to ensure that the Plaintiff would disproportionately pay the parties' massive consumer debt (see Complaint, pars. 10 (b)-(c)). Harris was acting (manifestly using instrumentalities of interstate commerce such e-mail and telephone) to collect debts owed to another – not only Harris, but the ultimate holders of the consumer debt. There is no loophole in the definitions that exempts her activity.

9
10
11
12
13
14
15
16
17
18

Accordingly, the Defendant simply ignores the above cited paragraphs of the complaint and argues, cavalierly, that Harris may not be liable under the statute for collecting her own attorney's fees. This could possibly fall outside of the statutory definition of "debt collector" to the extent that the fees in question were not "the debt of another" but to the extent that they were properly payable by Monette, even this evasion is not a sure thing. But the Defendant chooses to completely read out of the complaint the well pled allegations that Defendant Harris made misleading statements for the purpose of collecting Stephens' share of the parties' massive consumer debt. As such, the Defendant utterly fails to address the facts that the Plaintiff has actually pled.

19
20
21
22

4.   The Defendant Misunderstands and Misstates the Grounds for Retaliatory Liability
     under FIRREA

23
24
25
26
27

The Defendant argues that the Plaintiff may not sue for retaliation under FIRREA without first exhausting administrative remedies that are applicable to a claim against the FDIC. This is both confused and confusing. (The confusion is amplified by the fact that the Complaint seeks relief from Stephens and not Harris for the violation).

28

3730(h) confers a right of action on a whistle-blower, originally an "employee" but expanded to cover an "agent". See 3730(h)(1). All the Plaintiff needs to show under the statute is that the retaliation was caused by protected activity. The Plaintiff pleads that he objected to an illegal transaction in which Stephens lied serially in connection with obtaining a refinancing. In response and retaliation, she perjuriously claimed that he dissipated the proceeds from the refinancing burdening him with $596,000 in debt therefrom. The Plaintiff respectfully submits that this nexus is sufficient under the statute and that if more facts underlying his objection need to be pled, he may amend to plead same.

5. Conclusion

The Defendant has conscientiously identified every doctrinal roadblock to a disgruntled adversary suing what he thought was his attorney and, for good measure, has clogged the sluicegates with any floating debris within her grasp (e.g. *Noerr Pennington*). The problem is that *none* of these doctrinal roadblocks is intended to apply or may be twisted to apply to an action sounding in attorney malpractice or fraud.

The attorney-Defendant in this case had easy access to her prey. The Plaintiff was already under the influence of his wife as California Domestic Relations law 721 presumes. The Plaintiff believed, based on the assurances of his wife that they were to divorce amicably and, to the extent humanly possible, non-adversarially. The Defendant came into the picture and confirmed the Plaintiff's expectations: she was there to keep the parties out of court and help them come to a fair and private agreement.

The Defendant then used the Plaintiff's trust and goodwill as her own personal ATM machine. She invoiced the Plaintiff $7,000 and then asked for another $5,000. She got $15,000 per month of support for Ms. Stephens from a Plaintiff earning under $5,000 per year for the past

13

1   10 consecutive years: under $400 per month!  She knew this because the Plaintiff gave her

2   confidential information about his situation and objectives and shared his financial information

3   which showed his earning history and capacity.  The reason she was able to extract such

4   obscenely outrageous compensation and support was that she simply told the Plaintiff the law

5   required it of him. In other words – she coerced the Plaintiff.  He paid for many months while he

6   could by maxing out his borrowing capacity from family and friends (borrowing capacity that

7   could have gone into restoring his historically successful real estate investing activities) incurring

8   inhuman stress in the process and debts he is still struggling to repay.

9   
        The Defendant then made sure that the Plaintiff had no access to even one of the houses

10  the parties owned.  Since the Defendant took multiples of the Plaintiff's *annual* income every

11  *month* and then deprived him of shelter, it was inevitable that he would be rendered homeless

12  and he was. *These* are the well pled facts of the complaint. An attorney, using lies and coercion,

13  drained the Plaintiff is if he were a juice loan victim and left him literally on the street.

14      The Defendant proposes to the Court that she has a *privilege* to so act, under the

15  *Constitution* no less, and she argues, in the alternative, that *as a matter of law*, the Plaintiff, *from*

16  *the street where she consigned him* should have identified all of her lies and sued her sooner.

17      The Defendant's arguments might represent one of the more shameless displays of non-

18  ironic sophism in the history of litigation.  If the Defendant's actions are privileged, then

19  California lawyers are cold-blooded predators and California litigants are their helpless prey.

20      The Motion to Dismiss should be denied.

21      RESPECTFULLY SUBMITTED,

22      Date:  2/14/2018

23

24

25

26

27  _____

28      Carl A. Wescott. *Pro Se*

14

Carl Wescott
PO Box 190875
San Francisco, CA 94966
*in propria persona*
+1 415 335 5000



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISON

| | | |
|---|---|---|
| Carl Alexander Wescott, | ) | Case Number CV 17 5837 SK |
| Plaintiff | ) | |
| | ) | COMPLAINT FOR VIOLATIONS OF THE |
| ------------------ versus ------------------ ) | | FDCPA; RETALIATION UNDER FIRREA; |
| | ) | BREACH OF CONTRACT; CONVERSION; |
| Monette Stephens and | ) | LEGAL MALPRACTICE; WRONGFUL |
| Michelle Harris, esquire | ) | EVICTION; MORTGAGE FRAUD; CONSUMER |
| Defendants | ) | FRAUD; CIVIL FRAUD. |

---

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS**
**Exhibit A: SWORN DECLARATION OF CARL A. WESCOTT**

---

Carl A. Wescott, first being duly sworn, affirms under the penalties of perjury of the State of California the following:

1. I am the Plaintiff in the above captioned action, 50 years old and competent to testify. If called upon to do so, I would testify as follows.

2. Based on conversations with my-then wife Monette Stephens (first such conversation on the evening of February 25th, 2014) and both written and verbal assurances by Ms. Harris, I believed that Ms. Harris was representing my interests as well as Monette's in our divorce.

1

3.  Ms. Harris uses a March 4, 2014 e-mail from me as evidence that I knew she owed me no duties. However, we had two separate issues, only one of which was planned to be joint work and ongoing.

4.  The issue and case that Ms. Harris advised me she was going to represent Ms. Stephens on was a DVRO (that I believe Ms. Stephens had initially filed herself without an attorney). Ms. Stephens and I had had a physical altercation on the night of January 30th, 2014. The DVRO is case number FDV-14-810782. We planned not to go through the court system, but rather to amicably and privately figure out what to do. That case was about to be done because we had no plans to litigate.

5.  Ms. Stephens and I had also decided to separate and likely divorce. Our divorce is case number FDI-14-781666. Ms. Stephens and I had decided to come up with a separation agreement, give things almost six months or so, and then possibly divorce. Ms. Stephens was pretty sure at the time that we were going to divorce, and thus the plan was to do it amicably and to retain one attorney for the essential legal part who would advise both of us. The decision was likely going to come in August before our kids started school in September. On March 13th, 2014 Ms. Harris and I discussed her finalizing not only what Ms. Stephens and I colloquially called the "separation agreement", but also helping us draw up the paperwork for the divorce. Either way, we planned to jointly use her services.

6.  Yes, Ms. Harris said that she was representing Ms. Harris in the DVRO case FDV-14-810782. Yes, my email of March 4th stated that she was representing Ms. Stephens in that matter (which is why that email also says I have questions for her related to privacy).

7.  We had agreed to take the DVRO "out of the court system" (Ms. Harris' own words in her email to me) and instead write up our separation agreement, and, likely, the documents to facilitate our marital dissolution.

8.  My March 4th, 2014 email references proposes to ask her for her views of the law. I believed that Mrs. Harris was advising both of us, accurately and impartially, on the substance of the law as indicated by the very e-mail she attaches.

9.  What I also believed was that Ms. Harris was our joint legal advisor and counsel for our separation and likely divorce. This explains my reference to "saving money" --- Ms. Harris was taking care of the interests of both parties without the need to hire separate lawyers.

10. Yes, Ms. Harris did provide me with the form showing me she was Ms. Stephens' attorney – on March 13th, 2014 – just as I was about to sign the separation stipulation – and after I had asked her many questions about the law that she had answered. (I now realize most of what she said, including the need for $15,000/month of support to be paid by an indigent person, were lies to induce me to sign the one-sided separation agreement).

11. Ms. Harris' providing the Substitution of Attorney form was *weeks* after I now understand that she had was engaged by Ms. Stephens. It shows the DVRO case number of FDV-14-810782. She then said something to the effect of, "But don't worry about this since we're taking it out of court."

12. I didn't think it was relevant to Ms. Harris' helping Ms. Stephens and I with our separation agreement and divorce, as the DVRO was not going to be litigated in court and thus was a legal dead end.

13. Given that we were not litigating the DVRO, I figured 99%+ of what Ms. Harris would do was in our separation and divorce. In fact, presumably Ms. Harris just had to do the the one task of "taking the [DVRO] out of court" on the other case. Now that I know the language, I can say "dismiss" that case.

14. At no time did Ms. Harris advise me to engage counsel. At no time did Ms. Harris disclose that she was willing to misrepresent the law.

15. At no time did Ms. Harris state that she couldn't or wouldn't answer my family questions, and in fact she answered many.

16. We discussed Ms. Harris helping us in our divorce and other things, and at no point did she tell me she couldn't help us (jointly) with that.

*17.* Ms. Harris did advise me, repeatedly, that under the law I would be required to pay her fees and that, under the law, despite the fact that my income was only $5,000 per year, I would be required to pay $15,000 per month to Ms. Stephens, based on our former standard of living. Ms. Harris never disclosed that the law in California is based mainly on earned income and in fact there is even a device – the Dissomaster – where you plug in the numbers and it spits out exact support requirements.

*18.* As I've discovered, Ms. Harris lied to me about many other things. I didn't know anything about the law back then, and still have a lot to learn, but I did understand even back then that attorneys are supposed to abide by a code of ethics and be trustworthy.

*19.* Ms. Harris never advised me that based on our incomes, Ms. Stephens was required to pay me support (when we first met, Ms. Stephens was earning a high income as an investment banker. Ms. Stephens earned almost all the money during our marriage).

*20.* Ms. Harris never advised me that pursuant to California Family Codes 2030 to 2032, if we were not just having one attorney help us both through the process (as I believed), that Ms. Stephens would almost certainly be required to pay for my attorney.

*21.* Ms. Harris never disclosed that pursuant to California Rule 3-310 she could not ethically represent adverse interests.

*22.* Ms. Harris did not follow California Business and Professions Code 6200 with me even though I was the one paying her (and thought she was my attorney – jointly with Ms. Stephens) in the matter of our separation and divorce.

*23.* Ms. Harris not only didn't advise me to retain an attorney, but she didn't put language in our agreement that I had been advised to retain counsel and waived that right. Of course, she had not advised me to retain counsel prior, either.

*24.* As stated, prior to beginning to study the law I still somehow knew (I'm not sure how) that attorneys are supposed to follow ethical principles and be trustworthy.

*25.* In 2017, I learned about California Business and Professions Codes 6106, 6128(a), and 6068(d). Ms. Harris did not follow any of these codes.

*26.* In 2017, I learned that attorneys are not supposed to deceive even each other e.g. *Covello versus State Bar* (1955) 4S Cal 2d 57, 65-66. Attorneys are also not supposed to deceive a *pro se* adversary, especially when that adversary thinks he can trust and rely on the attorney.

*27.* In 2017, I learned about the California Attorney Guidelines of Civility and Professionalism. Ms. Harris did not follow those guidelines. Ms. Harris had negotiating tactics that were false: I didn't even know there was a negotiation going on. She was the professional advising us (Ms. Stephens and I) on what we needed to do, including what the law was.

*28.* Also in violation of CAGCP, Ms. Harris had "negotiating" tactics that were not in good faith and were abusive (including rendering me homeless and working to prevent me from seeing my children).

29. Now, I'm going to go back to my September 1st, 2014 eviction. When I was evicted, I experienced a period of shock. I had been told, in brief conversations with two lawyer acquaintances the week before, but without a meeting or consultation or presentation of all the facts, that I was likely entitled to occupy the 853 Ashbury house. The San Francisco police took a different view, and summarily evicted me. I concluded that the lawyers had been wrong and Ms. Harris had been right. I thought I might somehow be responsible for the situation. In any event, I was faced with homelessness and forced to improvise to find shelter and feed myself.

30. For over three years now, I've experienced an unrelenting and debilitating pressure to meet my most basic needs. I could not afford a lawyer. I still cannot.

31. In an abundance of candor, though I had a past as a successful person, these events including the eviction and subsequent homelessness greatly affected my confidence. I still don't have the confidence that I used to. That has been a factor for me.

32. I didn't have much time or ability (homeless, no computer) to research the law to expose Ms. Harris's misstatements. It also did not even occur to me, even as long as three years after my eviction, than an attorney would simply lie about what the law required even to

an adversary. Because I did not believe that Ms. Harris would simply lie about my legal obligations to obtain my money and (excess) funds for her client, I did not consider that the Defendants had conspired to trick me in to signing the agreement.  Because California codifies a prohibition against lawyers obtaining an advantage by lying at Business & Professions Code 6068, confirming what I understood as a layperson regarding attorneys having ethics, I believe my reliance was not unreasonable.

33. I now believe that rendering me homeless was part of the Defendants' strategy.  One part of the separation agreement has a clause with me giving up the San Francisco residence on September 1st, 2014.  When I pointed out on March 13th, 2014 that Ms. Stephens had agreed with me to swap houses indefinitely if necessary (in other words, if in August 2014 if we had not yet decided to divorce, but we hadn't figured out that we would re-unite), Ms. Harris told me not to worry about that, as we would be meeting to draft a new agreement then.

34. Instead Ms. Harris began the eviction process in that same August 2014 timeframe, unbeknownst to me at the time.  I believe this is evidence that as far back as March 2014, the Defendants planned to render me homeless.  There are emails about this new agreement in August that will further confirm this trickery.

35. Regardless, Ms. Harris drafted a stipulation that made it clear that Ms. Stephens would have the San Francisco house starting September 1st, 2014, and when I suggested we possibly put in language about where I would be living then, Ms. Harris induced me to sign the agreement by promising me not to worry about that.  I trusted her.  In retrospect, I now see how naive I was about these issues.

36. It was only in 2017 that I was able to educate myself on about these aspects of the law and understand the role attorneys play for their clients.  I now understand that no Court would have required a litigant who lived with his ex-wife in three houses to experience homelessness while she lived a life of luxury.  No Court would have required that same indigent person to pay his former spouse $15,000 per month and her attorney an extravagant fee. Within a few months of so educating myself, I filed this lawsuit.

37. Incidentally, Ms. Harris also overbilled me when she asked for $7,000 for the separation agreement. Hence, my reference to the "extravagant fee." I was able to borrow $1,000 of the $7,000 Ms. Harris told me to pay her, and she agreed to accept payments. When I later asked about how many hours she had invested and how she came up with $7,000, she sent me invoices with hours and fees for a fraction of the $7,000. I cannot recall the exact amount but I believe it was in the $2,000 to $3,000 range. I cannot find the bill now but I'm sure it can be obtained in discovery. This fits the pattern of Ms. Harris' taking advantage of my trust.

38. Ms. Harris freely shared her hours and costs with me. At no time that I can recall did Ms. Harris ever advise of client-attorney privilege. She freely shared other information with me, too.

39. I am an educated person and I have had successful prior careers as a computer programmer and a real estate investor (more than a decade ago). I will assure the Court that the law is intricate and challenging on a level I have never before experienced.

40. The law is difficult for me to understand and learn partly because it does not follow pure logic in the way a computer program does.

41. However, in 2014 my knowledge of the law, outside of certain narrow provisions pertaining to real estate, was almost *tabula rasa*. I relied on Ms. Harris as an expert and a professional and it never occurred to me she would give me inaccurate information.

42. Although it is not germane to this Motion, Ms. Harris appends copious materials relating to my altercation with Ms. Stephens in early 2014. This is clearly in aid of an effort to prejudice the Court. I will state here under oath that on that sole occasion when I used force against Monette it was for the purpose of defending myself against her. I greatly regret it now but it happened in the heat of the moment. I also acknowledge that I am a former cocaine addict.

43. The other allegations that I am a drug-addicted abuser are nonsense. The full list that Ms. Stephens and her attorneys trot out (as many parties due in a custody battle, often fabricated or greatly exaggerated) is that I am mentally ill, violent, a criminal, abusive, an

alcoholic, and a drug addict. I'm surprised Ms. Stephens has never claimed I'm a cannibal or pedophile. Nevertheless, these allegations have been endlessly recycled by Ms. Stephens and her lawyers for the purpose of prejudicing every family law Judge as well as Judges in other matters.

44. If I wished to play that game, I could and would provide the Court with details of Ms. Stephens prior history of domestic violence and her arrest and related plea, and my own allegations of Ms. Stephens' drug use, perjury, felony tax fraud, and other criminal fraud (beyond just the one instance of my objecting to her defrauding a federally-insured lender which is germane to FIRREA and this case).

45. However, I believe in the sanctity of this Court and our legal system. I believe that what should matter, and will matter, in District Court and in our case are the facts of our case, as well as logic and the law.


FURTHER AFFIANT SAYETH NAUGHT


Signed & sworn in San Francisco, California on the 14th day of February 2018.



_____
Carl A. Wescott

8